## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JULIE O'NEILL** | : | **Case No.  1:23-cv-00410** |
| **c/o Jacobs, Kleinman, Seibel & McNally LPA** | : | |
| **30 Garfield Place, Suite 905** | : | **Judge** |
| **Cincinnati, Ohio  45202** | : | |
| | : | |
| **Loftus** | : | |
| | : | |
| **-vs-** | : | **COMPLAINT WITH JURY** |
| | : | **DEMAND** |
| **SCRIPPS MEDIA, INC. DBA WCPO–TV** | : | |
| **c/o Corporation Service Company** | : | |
| **50 West Broad Street, Suite 1330** | : | |
| **Columbus, Ohio  43215** | : | |
| | : | |
| **And** | : | |
| | : | |
| **THE E.W. SCRIPPS COMPANY** | : | |
| **c/o Corporation Service Company** | : | |
| **50 West Broad Street, Suite 1330** | : | |
| **Columbus, Ohio  43215** | : | |
| | : | |
| **Defendants** | : | |

## INTRODUCTION

This lawsuit epitomizes the continued struggles experienced on an everyday basis by a large part of the working class community who have reached their mid-50's.  Older workers and in particular, older female employees, are increasingly viewed by modern day employers as over the hill and unsuitable to compete in today's fast paced business environment.  But these employers are wrong.  By relying upon their ageist stereotypes, employers debase the very qualities held by their most valued employees upon which these employers rely on an everyday basis to compete in an evolving work environment.

In this case, WCPO decided to ignore the long standing loyalty, dedication, and stellar performance of Julie O'Neill ("Julie") which she had exhibited for over 27 years and unceremoniously terminated her in September of 2022.  WCPO did so to satisfy its ill-perceived notion that a younger face on its daily newscast would generate greater ratings.  But the law prohibits WCPO's adverse job treatment of Julie because of her age.  Consequently, Julie is filing this suit to vindicate her legal rights that were so egregiously violated in the Fall of 2022.

I.      **THE PARTIES**

1.      Julie is a former employee of Scripps Media, Inc. dba WCPO-TV, and/or The E.W. Scripps Company ("WCPO").  Her employment was terminated on September 23, 2022.  She was informed on September 13, 2022, that her employment contract would not be renewed after December 31, 2022.

2.      Defendant Scripps Media, Inc. dba WCPO-TV is a foreign corporation doing business in Cincinnati, Hamilton County, Ohio.

3.      Defendant The E.W. Scripps Company is an Ohio corporation doing business in Cincinnati, Hamilton County, Ohio.   The co-Defendants are collectively referred to as "WCPO".  Both companies are employers as that term is referred to under the Equal Pay Act ("EPA"), Title VII, The Age Discrimination Employment Act ("ADEA"), and Ohio law.

II.     **JURISDICTION AND VENUE**

4.      This Court has jurisdiction under the EPA, 29 U.S.C. §206(d) et seq., 42 U.S.C. §2000e et seq., Title VII, 29 U.S.C. ¶626 et seq. the ADEA.

5.      This Court has supplemental jurisdiction over the Ohio non-federal law claims contained in this complaint pursuant to 28 U.S.C. §1367 on the grounds that these claims are so

related to the federal claims over which this Court has original jurisdiction, that they form the same case or controversy.

6.  Venue is proper in the Southern District of Ohio, Western Division, pursuant to 28 U.S.C. §1391 et seq. as a substantial part of the events giving rise to the claims occurred in this judicial district and the Defendants reside in this judicial district.

III.  **STATEMENT OF FACTS**

7.  Julie was hired by WCPO in July of 1995 from WSVN-TV in Miami, Florida. During Julie's 27 year employment tenure with WCPO, she performed her job duties in a competent and capable manner.  She received glowing performance reviews and was continually complimented on her work ethic and job performance.  She was promoted to be the morning anchor in 1998 for WCPO until 2002 when she was replaced by former employee, Kathrine Nero.  Julie returned to anchor the morning show after Nero was terminated in 2018.  She remained in that role until she was issued a final written warning on September 13, 2022, and notification that further association with WCPO would be terminated.

8.  The process to discriminatorily end Julie's employment from WCPO began in early January 2022, when WCPO hired Barry Fulmer ("Fulmer"), a male employee, as its News Director.

9.  In January 2022, it was expected that based upon Julie's prior excellent performance and longevity with WCPO, she would be the primary reporter and be given the assignment to cover on-site the Cincinnati Bengals March to the Playoffs, and ultimately the Super Bowl.  In early 2022, the Bengals were scheduled to participate in the NFL playoffs.  That schedule included:

> 1/22/22 Playoff game Cincinnati Bengals vs. Tennessee Titans in Nashville, TN
> 1/30/22 Payoff game Cincinnati Bengals vs. Kansas City Chiefs in Kansas City, MO
> 2/13/22 Super Bowl LVI Cincinnati Bengals v. LA Rams in Los Angeles, CA

10.     Julie requested that Fulmer assign her as the primary newsperson to cover these games in person, having followed the Bengals for over 27 years and quarterback Joe Burrow's collegiate career as an All American at LSU as a fellow LSU alum.

11.     WCPO management and Fulmer denied Julie's request and instead appointed Julie's co-anchor for all three of the on-site assignments.  In January 2022, Julie's co-anchor was a substantially younger male who was being paid more than Julie for similar duties she was performing.  Her co-anchor had been in the Cincinnati market for a little over one year.  The comparison between the two includes the following:

> Male Co-Anchor   Started broadcast news career in 2008 (14 yrs.)
> Julie O'Neill       started broadcast news career in 1991 (31 yrs.)
>
> Male Co-Anchor   started at WCPO October 2020 (2 yrs.)
> Julie O'Neill       started at WCPO July 1995 (27 yrs.)
>
> Male Co-Anchor's 2020 Salary is approximately $11,000 greater than Julie's
>
> Male Co-Anchor's 2021 Salary is approximately $5,000 greater than Julie's
>
> Male Co-Anchor's 2022 Salary is approximately $7,000 greater than Julie's

12.     After the Bengals defeated the Titans on January 22, 2022, Julie again requested to WCPO management and Fulmer that she be given the assignment to cover the Bengals playoff game at Kansas City the following week.  That request was denied and the younger male co-anchor who was being paid more money was chosen to cover the game.  The Bengals defeated Kansas City and were scheduled to play in the Super Bowl two weeks later.

13.     Once again, Julie requested that she be given the on-site assignment to provide the Bengals Super Bowl coverage in Los Angeles.

4

**February 7, 2022**

14.     The week before the Super Bowl, on or about Monday, February 7, 2022, Julie was informed by Fulmer that her substantially younger male co-anchor, who was being paid more, would lead the Super Bowl coverage for WCPO.

15.     Julie responded that Fulmer's decision "made no sense" given her institutional knowledge of the Bengals and its fan base, and her well-known enthusiasm for co-LSU Bengal Tiger alum Joe Burrow.  Fulmer informed her that the decision had been made to "keep the same team in place" that had been responsible for the on-site Bengals coverage at the previous playoff games.  Julie knew this statement was untrue as both the main anchors of Tanya O'Rourke and Craig McKee for WCPO were being sent to Los Angeles along with the weekend anchor Evan Millward.  McKee and Millward had not covered the previous playoff games.

16.     Julie further opposed Fulmer's decision by asking "am I the wrong age, gender, or color".  In response, Fulmer frowned at her, rolled his eyes, and walked away without so much as uttering a single word of denial.

17.     Shortly thereafter, multiple co-workers asked Julie why she had not been assigned the on-site Super Bowl coverage.  The only explanation she could provide was that it must have been because of her age, gender, or color.  These co-workers expressed shock and concern that she was being displaced at the station and that WCPO was ready to dump her as an on-air personality and ultimately as an employee.

18.     Fulmer became aware of Julie's co-employees voicing their concern about WCPO's treatment of her.  He confronted Julie about her conversations with her co-workers including claims that various federally protected statutory traits were the motivation for Julie's non-assignment.  Julie responded that multiple co-workers had approached her and expressed their

shock and dismay that she had been excluded from the Super Bowl assignment. Her discussions with co-workers were the result of their inquiries.

19.     Nevertheless, Julie continued her on-air excellence as a team player by working many extra hours to provide strong Super Bowl content for the station regarding the Bengals Super Bowl participation. She also assisted her on-site co-anchor with news sources and background information for his live coverage in Los Angeles. Julie worked extra days and long hours with much positive energy and enthusiasm to push the station's Super Bowl coverage.

## February 2022

20.     In February 2022, Julie alerted her attorney union representative, Tim Williams ("Williams") about her concerns regarding WCPO's and Fulmer's Super Bowl decision to not assign her the on-site coverage. Williams suggested that he contact Jeff Brogan ("Brogan"), WCPO General Manager, relating to the issue. Julie agreed and Williams called her after his conversation with Brogan, stating that Brogan told him, "Julie and Tanya are the faces of the station. I can't have both of them gone at the same time." Williams then followed up with Julie by sending her this message:

> To summarize my talk with Jeff, the first point he made was the decision on the Super Bowl coverage was a management decision. It was something they felt would be best for the station.
>
> He believes the big story is here locally, and it helps to have a familiar face handling that end of the coverage. With your tenure in the market, you were best suited for that role. They believe they have made the coverage assignment with an eye to provide the best coverage and highlight each member to that person's benefit.
>
> It's probably a good idea to go talk to him.
>
> Be careful out there.

6

**March 30, 2022**

21.     Approximately six weeks later, Julie was given her March 30, 2022, quarterly personnel evaluation.  For the first time, Fulmer and WCPO provided false criticisms of her performance, criticisms that had not been previously raised about her during her 27 year tenure at WCPO.  The evaluation of Julie stated in part:

> Julie continues to use her expertise and knowledge of the market to help guide her fellow team members with story pitches as well as gathering stories herself for our newscast.  Julie has worked extra hours on assignments in order to make sure she's able to gather elements.  This helps provide much needed news content for GMTS (Good Morning Tristate) and is much appreciated.
>
> There are items we would like to work on and fix:
>
> - Behavior with the team/on-air:  We understand you were upset about not going to the playoffs and the Super Bowl but you shared that on air and during commercial breaks.  Multiple team members expressed their concern and that it made them uncomfortable.
> - Laughing too much on air:  GM had to talk with you about this.  Being silly and losing focus can affect the newscast.
> - We need to work to improve tosses to weather.  One recent toss followed a story about beer and it became an awkward beer discussion with Jenn (Meteorologist Jennifer Ketchmark).  I've witnessed you speaking with Jenn in the break on how she wants you to toss to her.  This is a great example of communication I would like to continue.
> - Need to make sure you are in place in the studio before and during the newscast.  Production recently sent an email about issues regarding this.
> - We are continuing to work on accurate and clean scripts with producers but we need you to work on eliminating verbal crutches including "uh" repeatedly.
> - We also want to work on the chemistry between you and Adrian on air as well as your energy when reading scripts.

22.     Julie believed the statements in her performance review were false and were a predicate to "set her up" for a later termination.  Specifically, it was her understanding that multiple team members had not expressed their concern about Julie's comments, nor were they uncomfortable.  Further, she never made any derogatory statements nor showed any displeasure on-air about not getting the on-site Super Bowl assignment.  Her positive demeanor on air did not

amount to being silly, but remained professional at all times. Criticisms about the "accurate and clean scripts" were the result of misspellings, poor grammar, and half sentences authored by the individuals writing the scripts, not from Julie's on-air performance. Finally, there was no lack of chemistry between her and her co-anchor.

### June 28th and 29th, 2022

23.     During June 28 and 29, 2022, Julie and her co-anchor attended a two-day training seminar offered by a research and training company called "Magid". The training included the latest research on viewer preferences. This research indicated that viewers appreciated newscasts in which the anchors added warmth and personal moments to their presentations. WCPO's desire to add personal experiences to the newscasts by the co-anchors was confirmed by Fulmer as he understood that, based upon the Magid research, it was important to WCPO's viewers.

### August 12, 2022

24.     On August 12, 2022, Julie attended a meeting with Fulmer, HR Director Katie Rawe, and union rep attorney Williams. At this meeting, Fulmer claimed that he had not observed any improvement from Julie's on-air performance from the previous Spring. He cautioned Julie that she was not to "go off script" from a story that was not developing or changing. He also told Julie that his expectations were clear that she needed to eliminate her stumbles while on-air so that they do not remain an issue in her performance.

25.     Julie responded that any "stumbles" she was making on-air were the result of the scripts she was reading that continued to be full of grammar problems, misspellings, confusing wording and inaccuracies.

26.     Fulmer also alleged that Julie was seen "sleeping in the breakroom." Julie denied that she was sleeping, but indicated that there were times she closed her eyes for 15 – 30 minutes

during break so that she could perform well to anchor the one-hour noon newscast, which required a 10-hour work day.  She reminded him that it was common practice for members of the WCPO team to take a short nap during their breaks on longer workdays after getting up a 2:00 a.m.  Other members of the WCPO broadcast would regularly keep a pillow and blanket in their trunk to facilitate this rest period during their allotted breaks.  To Julie's knowledge no other news team member was chastised for closing their eyes.

27.    Fulmer also complained that her weather tosses to meteorologist Jennifer Ketchmark ("Ketchmark") were inappropriate.  Fulmer stated that the issue of stumbles and weather tosses would be revisited in approximately one month with himself and HR Director Rawe.

28.    After the meeting, Williams stated to Julie that he has never seen someone brought before Human Resources for these type of minor criticisms.  Julie's co-workers expressed their shock at Fulmer's criticisms and commented that any alleged stumbles by Julie were not noticeable, or any more common than that of other news anchors.  One co-worker advised Julie to cover herself by reading the scripts as written even if they are inaccurate and did not make sense.

### September 2, 2022

29.    Prior to September 2, 2022, Ketchmark had documented her day-to-day experience with Covid for all of her social media followers to see.  The disclosure of her Covid experience was made primarily during two lengthy Instagram live interactions.  One of the public Instagram posts lasted over ten minutes.  Ketchmark had communicated to her LIVE followers that in regard to her Covid experience, "I have nothing to hide.  As you guys know.  I never hide anything when it comes to my life."  At least one of her Instagram Live interactions was posted to her Facebook page.  At the time, Ketchmark had approximately 50,000 followers on her Facebook page.

30.     Ketchmark returned to WCPO on the morning of September 2, 2022.  At the top of the 5:00 a.m. newscast, Julie mentioned the word COVID as she and her younger male co-anchor welcomed Ketchmark back from her time off.  The exchange between the three was warm and relatable.

31.     During the first commercial break of the 5:00 a.m. newscast, Ketchmark complained to the assistant news director, Andy Delancey ("Delancey"), about Julie and her male co-anchor following the reference to her Covid condition.  After the conversation with Ketchmark, Delancey communicated to both Julie and her co-anchor:

> "I'm sure Jennnifer talked to you already but let's not talk about her Covid diagnosis on-air.  I totally understand that she has talked about it on social media and that's why you would think that it's fair game.  But let's just err on the side of not talking about medical stuff with someone unless we've talked with them first."

32.     Julie responded:

> "Totally understand and thank you Andy.  I have never brought up anyone having Covid on the air but she was so very public about it it seemed she was wanting to share her journey and I've had several people ask me how she is doing because of what they have seen on social media so it felt right in the moment.  It will not happen again.:)"

33.     Andy replied:

> "Totally – her Facebook post today got more than a thousand likes.  Have a great weekend"

Ketchmark's Facebook page stated, "I'm back!  Moving slow but back!"

34.     In communications with Julie's co-anchor, Delancey admitted that more people learned about Ketchmark's Covid through her social media than were probably watching the 5:00 a.m. morning newscast.

**September 8, 2022**

35.     On September 8, 2022, Julie and her co-anchor were summoned to Fulmer's office. Fulmer asked both of them to describe what occurred in the studio during that morning's newscast between Ketchmark and another employee. Fulmer told both of them in the meeting that "it seems there's no love lost between [Ketchmark] and anyone at the station." He acknowledged that "[Ketchmark] uses social media to get attention." Julie's co-anchor commented that Ketchmark had posted her Covid issues numerous times including talking about it LIVE on Instagram twice. Fulmer responded to the co-anchor comment by rolling his eyes as he said, "I listened to every second of it."

**September 12, 2022**

36.     While off on paid time off ("PTO"), Brogan sent a text to Julie on Monday, September 12, 2022, informing her that she will not be anchoring the WCPO morning show the following day. Instead, she needs to report to his office at 10:00 a.m. to "discuss the station's concerns that you [Julie] had been meeting with Katie and Barry about."

**September 13, 2022**

37.     On September 13, 2022, Julie attended a meeting with Brogan, Rawe, and Williams. At the meeting, Brogan presented Julie a copy of a Final Warning letter and read it to her aloud. A copy of the letter is attached as Exhibit A and incorporated by reference. At the conclusion of Brogan's oral recital, Brogan told Julie that she was being removed from the morning show effective immediately and that her contract which was scheduled to expire at the end of the year would not be renewed. He offered Julie two choices. First, she could work as a reporter until the end of her contract on December 31, 2022. Alternatively, she could "leave now and be paid her salary through the end of her contract." The reasons articulated in Exhibit A for the discipline

11

imposed on Julie are false and were a pretext to mask the discriminatory employment actions taken against Julie by WCPO.

38.     On September 16, 2022, Julie was provided a letter of separation and was officially terminated on September 23, 2022.

## <u>COUNT ONE</u>

### (Violation of the Equal Pay Act)

39.     Julie realleges the allegations contained in paragraphs 1 through 38 as if fully rewritten herein.

40.     The EPA prohibits employers such as WCPO from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work.  In order to establish a prima facie case of wage discrimination under the EPA, Julie must show that WCPO paid different wages to an employee of the opposite sex for "equal work on jobs the performance of which requires equal skill, effort, and responsibility and which are performed under similar working conditions."  Proof of discriminatory intent is not required.

41.     Once a plaintiff establishes a prima facie case, WCPO must prove that the wage differential is justified under one of four affirmative defenses.  These affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity of production; or (4) any other facto rother than sex.

42.     As described in paragraph 11 of the Complaint herein, WCPO violated the EPA by paying greater wages to her similarly situated male co-anchor for a position that required equal skill, effort, responsibility and which was performed under similar working conditions.

43.     WCPO lacks an affirmative defense to justify the difference in wages between Julie and her male co-anchor.

44. As a direct and proximate result, WCPO has violated the EPA entitling Julie to lost wages, prejudgment interest, and liquidated damages for its willful violation of that statute. WCPO has a history of paying females less than its similarly situated male employees for equal work. Julie requests reasonable attorney's fees as a result of WCPO's willful violation of federal law.

**COUNT TWO**

**(Violation of the ADEA)**

45. Julie realleges the allegations contained in paragraphs 1 through 44 as if fully rewritten herein.

46. On or about December 20, 2022, Julie filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of the ADEA. A copy of the Charge is attached as Exhibit B. This filing constitutes a dual filing of a charge of discrimination with the Ohio Civil Rights Commission ("OCRC")

47. Sixty days have passed since the filing of the Charge and pursuant to 29 U.S.C. §626(d), this Court has jurisdiction for Julie's claim under the ADEA.

48. Julie states that she is over the age of 40.

49. During the time of her employment with WCPO, she performed her job duties in a capable and competent manner.

50. On or about September 13, 2022, Julie was informed that she was being disciplined and that her employment contract would not be renewed on December 31, 2022. The reasons offered for these employment actions by WCPO were a pretext for unlawful discrimination.

51. Julie was replaced by Kristen Skovira, a substantially younger person, as the anchor for the WCPO morning show.

13

52.     Additionally, Julie's male co-anchor, who is substantially younger, engaged in similar conduct which WCPO claims provided the basis to discipline her on September 13, 2022, and ultimately terminating her employment.  He was not disciplined nor terminated from his employment, yet he was similarly situated as Julie.

53.     The discipline imposed on Julie on September 13, 2022, the non-renewal of her employment contract, and her termination on September 23, 2022, were because of her age in violation of 29 U.S.C. §626 et seq.

54.     WCPO has a history of a pattern and practice of discrimination against older employees and especially older female employees such as Julie.

55.     Julie demands all relief to which she is entitled under the ADEA including a back pay and front pay award, prejudgment interest, liquidated damages for is willful violation of the federal statute, and reasonable attorney's fees.

## COUNT THREE

### (Violation of the ADEA in Retaliation for Julie's Opposition to WCPO's Discrimination Against her based on Age)

56.     Julie realleges the allegations contained in paragraphs 1 through 55 as if fully rewritten herein.

57.     In January and February of 2022, Julie complained to WCPO management that the Bengals playoff and Super Bowl assignments to her substantially younger, male co-anchor were because of her age in violation of the ADEA.

58.     Subsequent to her opposition to WCPO's unlawful conduct, its management, including Fulmer, began a campaign of unwarranted criticism of Julie's performance in order to set up her termination at a later date.

14

59.     WCPO's September 13, 2022 discipline, non-renewal of her employment contract, and termination were in retaliation for her complaints of unlawful discrimination.

60.     Julie demands all relief to which she is entitled under the ADEA including a back pay and front pay award, prejudgment interest, liquidated damages for its willful violation of the federal statute, and reasonable attorney's fees.

## COUNT FOUR

### (Sex Discrimination by WCPO in Violation of Title VII)

61.     Julie realleges the allegations contained in paragraphs 1 through 60 as if fully rewritten herein.

62.     On or about December 20, 2022, Julie filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of Title VII. A copy of the Charge is attached as Exhibit B. This filing also constitutes a dual filing of a charge of discrimination with the Ohio Civil Rights Commission ("OCRC")

63.     Julie received a Right to Sue letter from the EEOC on or about June 28, 2023. A copy of that letter is attached as Exhibit C. Julie has fulfilled the jurisdiction requirements to assert her claims under Title VII in this Court.

64.     Julie states that she is female.

65.     During the time of her employment with WCPO, she performed her job duties in a capable and competent manner.

66.     On or about September 13, 2022, Julie was informed that she was being disciplined and that her employment contract would not be renewed on December 31, 2022. She was terminated on September 16, 2022 effective September 23, 2022. The reasons offered for these employment actions by WCPO were a pretext for unlawful discrimination.

67.     Julie was replaced by Kristen Skovira as the anchor for the morning show.

68.     Julie's male co-anchor was engaged in similar conduct which WCPO claims provided the basis to discipline her on September 13, 2022.  He was not disciplined, nor terminated, nor has he been informed that his employment contract is subject to non-renewal.  Yet he is similarly situated to Julie.

69.     The discipline imposed on Julie on September 13, 2022, the non-renewal of her employment contract, and her termination on September 23, 2022, were because of her sex in violation of Title VII.

70.     WCPO has a history of a pattern and practice of discrimination against older female employees such as Julie.

71.     Julie demands all relief to which she is entitled under Title VII and 42 U.S.C. §1988(b) including a back pay and front pay award, compensatory damages, punitive damages, prejudgment interest, and reasonable attorney's fees.

72.     Julie further states that in the event the Court or jury finds that gender was a motivating factor for the disciplinary actions, non-renewal of contract, or her termination, but that WCPO would have taken the same actions notwithstanding its unlawful motivation, she requests the Court issue a declaratory judgment, injunctive relief, and award the payment of her reasonable attorney's fees pursuant to 42 U.S.C. §2000e-2(m) and 42 U.S.C. §2000e-5(g)(2)(B)(i).

## COUNT FIVE

### (Retaliation by WCPO in Violation of Title VII)

73.     Julie realleges the allegations contained in paragraphs 1 through 72 as if fully rewritten herein.

74.     In January and February of 2022, Julie complained to WCPO management that the Bengals playoff and Super Bowl assignments to her male co-anchor were because of her gender in violation of Title VII.

75.     Subsequent to her opposition to WCPO's unlawful conduct, its management, including Fulmer, began a campaign of unwarranted criticism of Julie's performance in order to set up her termination at a later date.

76.     WCPO's September 13, 2022 discipline, non-renewal of her employment contract, and termination were in retaliation for her complaints of unlawful discrimination.

77.     Julie demands all relief to which she is entitled under Title VII and 42 U.S.C. §1988(b) including a back pay and front pay award, prejudgment interest, compensatory damages, punitive damages, and reasonable attorney's fees.

## COUNT SIX

### (WCPO's Violation of Ohio Law Prohibiting Age and Sex Discrimination)

78.     Julie realleges the allegations contained in paragraphs 1 through 77 as if fully rewritten herein.

79.     Julie states that the facts identified in this complaint constitute a violation of age and sex discrimination under Ohio Revised Code §4112.02(A).

80.     Julie states that the filing of the Charge of Discrimination with the EEOC constitutes a dual filing with the OCRC.  Julie has sent a request to the OCRC for a separate right to sue to which she is presently entitled and will file that document with the Court once it is received.

81.     Julie requests all relief to which she is entitled to under Chapter 4112 proximately caused by WCPO's unlawful conduct.

## COUNT SEVEN

### (A Claim for Retaliation Under State Law)

82.     Julie realleges the allegations contained in paragraphs 1 through 81 as if fully rewritten herein.

83.     WCPO's termination of Julie was in retaliation for her opposition to its unlawful activity in discriminating against her because of her age and gender.

84.     Julie's termination is a violation of Ohio Revised Code §4112.02(I).   Julie is entitled to all relief set forth in Ohio Revised Code Chapter 4112.  Once Julie receives a Right to Sue letter from the OCRC, it will be filed with the Court.

WHEREFORE, Julie demands judgment against Defendants in an amount to be determined at trial.  The amount includes an award for back pay, reasonable front pay, liquidated damages, compensatory and punitive damages, prejudgment interest, and reasonable attorney's fees.  Julie requests a trial by jury on all issues herein.

Respectfully submitted,

/s/   Mark J. Byrne
**MARK J. BYRNE (0029243)**
**KATHLEEN R. BYRNE (0099931)**
JACOBS, KLEINMAN, SEIBEL & McNALLY, LPA
Cincinnati Club Building
30 Garfield Place, Suite 905
Cincinnati, Ohio  45202
Phone:  (513)  381-6600
Fax:     (513)  381-4150
E-mail:  mbyrne@jksmlaw.com
              kbyrne@jksmlaw.com
*Attorneys for Plaintiff*