IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| JULIE O'NEILL, | : | Case No. 1:23-cv-410 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| SCRIPPS MEDIA, INC., d/b/a | : | |
| WCPO-TV, et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendant Scripps Media, Inc.'s Motion for Summary Judgment (Doc. 60). Plaintiff filed a Response in Opposition (Doc. 76), to which Defendant filed a Reply in Support (Doc. 79). Thus, this matter is ripe for the Court's review. For the following reasons, Defendant's Motion for Summary Judgment (Doc. 60) is **GRANTED**.

## FACTS

### I.    Plaintiff's Employment

Plaintiff Julie O'Neill began working for Defendant Scripps Media, Inc., doing business as WCPO-TV ("WCPO"), as a night side reporter in 1995. (O'Neill Dep., Doc. 56, Pg. ID 369-70.) In 1998, Plaintiff became an anchor for WCPO's morning show. (*Id.* at Pg. ID 371.) But, in 2003, WCPO replaced her with another female reporter after management informed Plaintiff that they were not satisfied with the show. (*Id.* at Pg. ID 372.) From

2003 to 2018, Plaintiff worked as a weekend anchor, until 2018, when WCPO promoted Plaintiff back to morning anchor. (*Id.* at Pg. ID 378-79.) WCPO General Manager Jeff Brogan had worked as a producer when Plaintiff originally anchored the morning show and was the manager who promoted her back to the morning anchor position. (*Id.* at Pg. ID 375; *see also* Anchor Multi-Media Journalist Employment Agreement, Doc. 56-1, Ex. 3, Pg. ID 466.) Plaintiff testified that she had a "very friendly" relationship with Brogan. (O'Neill Dep., Doc. 56, Pg. ID 375.) As morning anchor in 2021, Plaintiff's annual salary was $152,000; in 2022, her salary jumped to $158,000. (*Id.* at Pg. ID 388.)

## II. Performance Issues and Complaints

In September 2019, at the end of the morning broadcast, Plaintiff noticed that the white and black reporters were standing on opposite sides of the stage; this prompted her to make an unscripted comment on air that WCPO does not believe in segregation. (O'Neill Dep., Doc. 56, Pg. ID 391-92.) At least one employee complained to Brogan about the comment. (Brogan Dep., Doc. 57, Pg. ID 625, 647.) Following the incident, the National Association of Black Journalists Local Cincinnati Chapter approached WCPO management to discuss Plaintiff's comment. (*Id.* at Pg. ID 625.) As a result of the comment, Plaintiff's direct manager, Mike Canan, gave Plaintiff a two-day suspension. (Suspension, Doc. 56-1, Ex. 7, Pg. ID 571.) Plaintiff had a good relationship with Canan but believed that the network made a bigger deal about her comment than she thought appropriate. (O'Neill Dep., Doc. 56, Pg. ID 382.)

In September 2020, Canan gave Plaintiff a performance review called a "check-in," which was typically provided in each quarter. (Q3 2020 Performance Review, Doc. 56-1,

2

Ex. 14, Pg. ID 583; O'Neill's Dep., Doc. 56, Pg. ID 386.) At this review, Canan told Plaintiff that she must "reduce ad-libbing" and "cut down on chat during tosses," to other reporters, which is when a newscaster transitions the broadcast to another reporter. (Q3 2020 Performance Review, Doc. 56-1, Ex. 14, Pg. ID 583.) Additionally, she was told to "[n]ever ask a question of a co-worker that she has not prepared that co-worker for," and to "keep the moments where it is just loud laughter to a minimum." (*Id.*) At the end of 2020, Plaintiff had another "check-in," but this time with Executive Producer Albert Stitchka. (Q4 2020 Performance Review, Doc. 56-1, Pg. ID 586.) This review stated that Plaintiff had improved with ad-libbing but reiterated that she should only ad-lib when she knew "100% of the facts," and that she should not let her on-air moments "linger too long and go off topic." (*Id.*)

Meanwhile, in October 2020, Adrian Whitsett, Plaintiff's co-anchor, began working at WCPO. (Whitsett Dep., Doc. 58, Pg. ID 973.) When he was hired, Whitsett was over the age of forty, like Plaintiff. (*Id.* at Pg. ID 970.) Whitsett had previously been anchor on a successful morning show in Orlando, Florida. (*Id.*) When his contract in Orlando was up for renewal, WCPO contacted Whitsett and he negotiated a specific salary with WCPO to account for the raise that the Orlando station would have given him for a renewed contract, as well as the Ohio state and local taxes that he did not pay in Florida. (*Id.* at Pg. ID 973.) He also requested a higher salary because he would be leaving a larger market to a smaller market in Cincinnati. (*Id.*) As a result of his negotiation, Whitsett's annual salary when he started was $165,000. (*Id.*)

3

On Election Day, November 3, 2020, Plaintiff was assigned to anchor the noon show. (Canan Letter, Doc. 56-1, Ex. 8, Pg. ID 572.) But, Plaintiff did not show up to work. (*Id.*) Accordingly, WCPO had to air pre-recorded material on the live show instead of reporting on the real-time election updates. (O'Neill Dep., Doc. 56, Pg. ID 396.) WCPO scrambled to substitute another anchor for the second half of the show. (*Id.* at Pg. ID 397.) After her absence, Canan drafted a letter reminding Plaintiff that she must "be on set 15 minutes before the start of any show," and that it is her responsibility to follow her work schedule. (Canan Letter, Doc. 56-1, Ex. 8, Pg. ID 572.) Plaintiff was further warned that "[a]ny further incidents may lead to the immediate ending" of her employment. (*Id.*) Plaintiff admitted that she knew she must be on set fifteen minutes early and follow her work schedule. (O'Neill Dep., Doc. 56, Pg. ID 397.)

In early 2022, WCPO hired Barry Fulmer as the News Director. (O'Neill Dep., Doc. 56, Pg. ID 397; Fulmer Dep., Doc. 59, Pg. ID 1007.) Around this time, the Cincinnati Bengals began their playoff run which led to them playing in the Super Bowl. (O'Neill Dep., Doc. 56, Pg. ID 397-98.) As part of WCPO's coverage of this playoff run, Plaintiff covered the first home playoff game, but Brogan remarked that Plaintiff "struggled," as there were moments where she "tripped up a bit." (Brogan Dep., Doc. 57, Pg. ID 634-35.) Plaintiff requested to Brogan and Fulmer that she cover the team's first away playoff game, but Brogan chose Whitsett and evening anchor Tanya O'Rourke; this pair eventually covered the Super Bowl game in February 2022. (*Id.* at Pg. ID 634; O'Neill Dep., Doc. 56, Pg. ID 398-99, 401.) O'Rourke is another female anchor around the same age as Plaintiff, and Plaintiff testified that the anchors who covered these games "did a nice job."

4

(O'Neill Dep., Doc. 56, Pg. ID 400-02.) Brogan stated that he initially chose Whitsett to give him "good exposure," and then kept the same crews for subsequent games because of the tight deadlines and different procedures that they learned from the first away game. (Brogan Dep., Doc. 57, Pg. ID 635.) While Whitsett and O'Rourke were away, Plaintiff anchored at the station in Cincinnati. (*Id.* at Pg. ID 636; O'Neill Dep., Doc. 56, Pg. ID 411.) Plaintiff had been told over email that she would not cover the Super Bowl, and she admits that the decision to have Whitsett and O'Rourke cover live "was appropriate" and a "solid decision." (O'Neill Dep., Doc. 56, Pg. ID 409; Super Bowl Email, Doc. 56-1, Ex. 9, Pg. ID 573.)

However, during a live broadcast for one of the playoff games, Plaintiff made, as she described it, a "tongue in cheek" remark during a toss, or transition, about Whitsett covering the game. (O'Neill Dep., Doc. 56, Pg. ID 405.) Plaintiff stated that she was upset that she was not covering the Super Bowl and teased Whitsett on air about it. (*Id.* at Pg. ID 402.) Around this time, Plaintiff stopped Fulmer in the hallway to ask why she was not chosen to cover the Super Bowl. (*Id.* at Pg. ID 408.) She specifically asked, "Am I the wrong age, the wrong gender, or the wrong color?" (*Id.*) Plaintiff also spoke with her union representative, Tim Williams, about this issue, and he informed her that the decision was from management, and that she was needed locally. (*Id.* at Pg. ID 410.) Plaintiff, Williams, and Katherine Rawe, WCPO's Human Resources representative, all met to discuss Plaintiff's concerns about the Super Bowl. (Rawe Dep., Doc. 64, Pg. ID 1084.) Rawe wrote down that Plaintiff felt Whitsett was chosen because of his skin color,

5

sex, and age, but did not follow up with an investigation into potentially discriminatory actions. (*Id.* at Pg. ID 1094.)

Throughout 2022, Brogan counseled Plaintiff several times about her on-air conduct, including awkward tosses or inappropriate comments. (Brogan Email, Doc. 56-1, Ex. 10, Pg. ID 574; O'Neill Dep., Doc. 56, Pg. ID 416.) Specifically, Plaintiff had made a comment on air about Meteorologist Jennifer Ketchmark's knowledge of alcohol, referencing one of Ketchmark's social media posts. (O'Neill Dep., Doc. 56, Pg. ID 416.) Ketchmark complained about the comment, and Plaintiff received counseling about it during her first quarter check-in with Stitchka, the Executive Producer. (*Id.*; March 2022 Performance Review, Doc. 56-1, Ex. 13, Pg. ID 581.) The review included comments about Plaintiff's repeated complaints that she did not cover the Super Bowl, along with Plaintiff's excessive laughter on air, awkward tosses, lack of chemistry with her co-anchor, Whitsett, and Plaintiff's use of "verbal crutches" such as "uh." (Q1 2022 Performance Review, Doc. 56-1, Ex. 13, Pg. ID 581.)

Plaintiff received another review for the third quarter of 2022. (Q3 2022 Performance Review, Doc. 56-1, Ex. 16, Pg. ID 588.) This review reminded Plaintiff that she needed to show up on time for the broadcast and criticized her on-air tosses. (*Id.*) It also again mentioned Plaintiff's lack of chemistry with her co-anchor and her continued issues with ad-libbing and incorrect pronunciations. (*Id.*) Plaintiff, Fulmer, and a Human Resources representative all met in August 2022 to discuss the issues mentioned in her review; Fulmer stated that he did not see enough improvement in Plaintiff's performance and reminded her about avoiding verbal crutches, ad-libbing, and verbal stumbles.

(O'Neill Dep., Doc. 56, Pg. ID 440.) Plaintiff admitted that she had issues with verbal stumbles and could improve her tosses and on-air performance. (*Id.* at Pg. ID 427-28.)

On September 2, 2022, Plaintiff covered a broadcast with Ketchmark after Ketchmark had returned from an illness that kept her at home. (O'Neill Dep., Doc. 56, Pg. ID 429.) Ketchmark had posted on her social media page that she had COVID. (*Id.*) Plaintiff mentioned on air that Ketchmark was returning from a COVID infection. (*Id.*) No one else had mentioned Ketchmark's specific illness, or given any indication about her medical issues, nor did Ketchmark give Plaintiff consent to disclose her medical information on air. (*Id.* at Pg. ID 429-30.) Plaintiff stated that, since Ketchmark had posted about her infection on her public social media page, it was acceptable for Plaintiff to say it on the broadcast. (*Id.* at Pg. ID 429.) However, Ketchmark was upset that Plaintiff had made the comments on air and complained to management. (*Id.*) Assistant News Director Andy Delancy informed Plaintiff that it was not appropriate to disclose medical information on air without the individual's consent. (*Id.* at Pg. ID 420.)

On September 13, 2022, Plaintiff met with Brogan, WCPO's Human Resources representative, Katherine Rawe, and the union representative, Williams; Brogan read her a letter indicating that she was receiving a final written warning for her failure to follow directions and her unprofessional conduct, with the COVID comment included as the most recent example. (O'Neill Dep., Doc. 56, Pg. ID 433.) The letter specifically referenced that Plaintiff's behavior showed a pattern of misconduct dating back to 2019. (*Id.*) Plaintiff also was told that she would no longer be the morning anchor, effective immediately, and that her anchor contract would not be renewed at the end of her term, which was

7

December 31, 2022. (*Id.* at Pg. ID 435.) WCPO offered for Plaintiff to return to a reporter position for the remainder of her contract term, or to leave and be paid through the remainder of her contract. (*Id.*) Plaintiff chose the latter. (*Id.* at Pg. ID 439.) Brogan was the ultimate decision-maker for these issues. (Brogan Dep., Doc. 57, Pg. ID 656.) After Plaintiff's separation from WCPO, the station replaced her with anchor Kristen Skovira, who was thirty-nine years old at the time. (*Id.* at Pg. ID 610; Staff Coverage Form, Doc. 57-1, Ex. 6, Pg. ID 684.)

During the course of her employment, Plaintiff did not raise any issues of race, sex, or age discrimination in a formal capacity. (O'Neill Dep., Doc. 56, Pg. ID 440.) And, Plaintiff does not believe that her co-anchor, Whitsett, or Meteorologist Ketchmark ever engaged in conduct for which they should have been disciplined. (*Id.* at Pg. ID 443.) Plaintiff testified that she was familiar with WCPO's handbook and policy prohibiting discrimination or retaliation. (*Id.* at Pg. ID 389.) Specifically, WCPO requires an employee to go to Human Resources with any equal employment, legal, or similar issues. (*Id.*) Plaintiff did not utilize any of these mechanisms to formally lodge a complaint of discrimination. (*Id.* at Pg. ID 390; WCPO Handbook, Doc. 56-1, Ex. 6, Pg. ID 494.) After she left WCPO, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging a violation of the Age Discrimination in Employment Act ("ADEA").

**PROCEDURAL POSTURE**

On June 29, 2023, Plaintiff filed her Complaint in this Court, and on October 30, 2023, Plaintiff filed her Amended Complaint, bringing claims against Defendants E.W.

8

Scripps Company and Scripps Media, Inc. (*See* Docs. 1, 10.) The Amended Complaint alleges: (1) violation of the Equal Pay Act; (2) violation of the ADEA; (3) retaliation for Plaintiff's opposition to Defendant's age discrimination; (4) violation of Title VII; (5) retaliation for Plaintiff's opposition to Defendant's age discrimination; (6) age and sex discrimination under Ohio Revised Code § 4112.02(A); (7) retaliation under Ohio law; and (8) aiding and abetting under Ohio law. (Doc. 10.) On November 13, 2023, Defendants filed a Motion to Dismiss (Doc. 15). The Magistrate Judge issued a Report and Recommendation on the Motion (Doc. 22), which this Court adopted in its entirety (*see* Order Adopting Report and Recommendation, Doc. 23). The Order dismissed with prejudice all claims against Defendant E.W. Scripps Company. (Doc. 23.) At this juncture, only Defendant Scripps Media, Inc. remains, along with the following claims: non-willful violations of the Equal Pay Act (Count I), employment discrimination under state and federal law (Counts II, IV, and VI), and retaliation (Counts III, V, and VII). (*Id.*) On August 15, 2025, Defendant filed a Motion for Summary Judgment, which has been fully briefed. (*See* Docs. 60, 76, 79.)

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to

specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forth probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

Plaintiff's claims fall into three categories: (1) an Equal Pay Act claim, (2) discrimination-based claims, and (3) retaliation-based claims. The Court will analyze each set in turn.

### I.    Count I: Equal Pay Act

The Equal Pay Act (EPA) "prohibits employers from paying an employee at a rate less than that paid to an employee of the opposite sex for performing equal work." *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (citing 29 U.S.C. § 206(d)(1)). To establish a prima facie case under the EPA, a plaintiff must show that an employer paid different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id.* (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188,

10

195 (1974)). Once a plaintiff establishes a prima facie EPA violation, the defendant "bears both the burden of persuasion and production on its affirmative defenses." *Id.* at 364-65. One such affirmative defense is that the employees were paid differently because of a factor other than sex. *Id.* at 365. But, that factor must be one that was "adopted for a legitimate business reason." *Id.* (quoting *EEOC v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988)) (cleaned up). "[T]he burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." *Brennan*, 523 F.2d at 1031. At the summary judgment stage, a plaintiff "need not set forth evidence from which a jury could infer that the employer's proffered reason for the wage differential is pretextual," but instead, "the defendant who makes the motion . . . must demonstrate that there is no genuine issue as to whether the difference in pay is due to a factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998). In other words, the defendant must establish the defense so clearly that "no rational jury could have found to the contrary." *Id.* at 800.

In its Motion, WCPO does not contest whether Plaintiff has established a prima facie violation of the EPA. (*See* Motion, Doc. 60, Pg. ID 1037-39.) Indeed, it is undisputed that Plaintiff's co-anchor, Whitsett, had a higher salary than Plaintiff, and the two were performing substantially the same job duties as anchors for the morning show. (Brogan Dep., Doc. 57, Pg. ID 611; Whitsett Contract, Doc. 57-1, Ex. 4, Pg. ID 671-79; O'Neill Contract, Doc. 57-1, Ex. 32, Pg. ID 863-70.) Accordingly, the burden shifts to WCPO to prove that an affirmative defense applies.

As an affirmative defense, WCPO argues that there were several factors other than sex that contributed to Whitsett's higher pay. (Motion, Doc. 60, Pg. ID 1037.) Specifically,

11

WCPO points out that, during his hiring process, Whitsett negotiated a specific salary, higher than his salary at the time, to account for the fact that the job required him to move from Orlando, Florida, where he was not subject to state or local income tax, to Cincinnati, Ohio, where he was subject to both. (*Id.* at Pg. ID 1038.) Additionally, he had expected to negotiate a raise if he stayed in Orlando, as his contract was up for renewal; moving to Cincinnati thus meant he was giving up the opportunity for a raise. (*Id.*) And, the job with WCPO presented a much smaller market than his role in Orlando. (*Id.*) Accordingly, WCPO argues that Whitsett's negotiated salary was based on several market factors, not sex, making summary judgment on this claim proper. (*Id.* (citing *Foco v. Freudenberg-NOK Gen. P'ship*, 549 F. App'x 340, 347 (6th Cir. 2013)).)

In response, Plaintiff points out that "no authority supports the concept that an employee's prior salary or demand for a specific salary is sufficient in isolation to justify a wage differential." (Response, Doc. 76, Pg. ID 1561 (citing *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 510 (6th Cir. 2021)).) And, Brogan, the General Manager of WCPO, did not know of or receive any documentation identifying Whitsett's previous salary. (*Id.* at Pg. ID 1562 (citing Brogan Dep., Doc. 57, Pg. ID 663).) According to Plaintiff, WCPO's assertion that the prior market required greater pay for Whitsett "is contrary to the Sixth Circuit's pronouncement in *Briggs*." (*Id.*) First, though, the Court notes that Brogan testified that he "[could not] recall" what Whitsett made in Orlando, but that he "may have at the time" known the exact amount. (Brogan Dep., Doc. 57, Pg. ID 663-64.) Thus, Plaintiff's statement that he did not know Whitsett's salary at all is inaccurate. And, Brogan did state that candidates "usually" tell him their current salaries, even if he could

12

not remember at the time of his deposition what Whitsett's Orlando salary had been. (*Id.* at Pg. ID 614-15.) Additionally, Whitsett stated that he had told his negotiating agent that he wanted to be paid more in order to fill the gap between his prior salary and the new taxes, implying that the negotiating agent and Brogan discussed the prior salary. (Whitsett Dep., Doc. 58, Pg. ID 972-73.) Nevertheless, Brogan testified that he considers "a number of factors" when determining a salary range for a new anchor, like Whitsett, including "the market size, the station, the success of the station, . . . what they're currently making, and the budgeted amount." (*Id.* at Pg. ID 616; *see also* Pg. ID 613.) To this point, WCPO reiterates that Whitsett's salary was not "based in isolation on his prior salary," but instead, it was based on his relocation from a larger media market with no income tax. (Reply, Doc. 79, Pg. ID 1659.) And, the Sixth Circuit has found that "competitive market conditions and wage earnings history are factors other than sex." (*Id.* (citing *Jones v. St. Jude Medical S.C., Inc.*, 823 F. Supp.2d 699, 757 (S.D. Ohio 2011); *Perkins v. Rock-Tenn. Servs., Inc.*, 700 F. App'x 452, 457 (6th Cir. 2017)).)

Examining these cases, the Court agrees with WCPO's argument. In *Jones*, the defendant, St. Jude Medical Center, justified higher salaries for two male employees—both "competitive hires" rather than "internal transfer candidates"—as a way to "incentivize them to switch to St. Jude, and to compensate them for the book of business they were expected to bring with them to St. Jude and for the net gain to St. Jude." 823 F. Supp.2d at 757. Accepting this argument, the court specifically noted that "the law is clear that a salary differential is justified under these defenses where it is necessary to meet market conditions and hire away a well-qualified candidate from a competitor." *Id.*

13

(citing *Brune v. BASF Corp.*, 41 F. Supp.2d 768, 778 (S.D. Ohio 1999), *aff'd in part, and rev'd in part on other grounds*, 234 F.3d 1267 (6th Cir. 2000) (citing *Smallwood v. Jefferson Cnty., Ky.*, No. 95-5686, 1996 WL 490353, at *3 (6th Cir. Aug. 27, 1996))).

The United States District Court for the Eastern District of Michigan reached a similar conclusion in *Foco v. Freudenberg-NOK Gen. P'ship*, 892 F. Supp. 2d 871 (E.D. Mich. 2012), *aff'd*, 549 F. App'x 340 (6th Cir. 2013). While the plaintiff failed to establish her prima facie case, the court noted that her claim would have nevertheless failed because of the defendant's reliance on factors other than sex to justify a higher salary for her male counterparts. *Foco*, 892 F. Supp.2d at 879. Those factors were: "experience, education, expertise," and particularly relevant for present purposes, "prior salary, negotiations, market value, and the need to attract particularly well-qualified candidates." *Id.* The Sixth Circuit affirmed this conclusion that "no reasonable juror could find that [the plaintiff]'s sex played any role in the disparity," given defendant's other reasons for the salary differential. *Foco v. Freudenberg-NOK Gen. P'ship*, 549 F. App'x 340, 345 (6th Cir. 2013).

While Plaintiff cites *Briggs* to show that WCPO cannot simply rely on Whitsett's previous salary or requested salary as an affirmative defense for the pay differential, the Court is unpersuaded by this argument. In *Briggs*, as Plaintiff points out, the court emphasized that prior salary cannot be used "in isolation" to justify a wage difference. 11 F.4th at 510. The Sixth Circuit then proceeded to describe other cases in which prior or negotiated salary had been used as a factor in conjunction with other factors that supported a new employee's higher pay. *Id.* (collecting cases). These cases include *Foco*, along with *Ambrose v. Summit Polymers, Inc.*, 172 F. App'x 103, 107-08 (6th Cir. 2006),

14

where the employer took into account "not only prior salaries but also skills and experience" of the new employee, and it "paid what was required to recruit" this employee.

The record in this case similarly distinguishes this matter from *Briggs*. As stated above, WCPO described that Whitsett was performing well as an anchor in Orlando, he was up for a raise, and WCPO wanted to recruit him for the station. While Whitsett "stood out" to Brogan, Whitsett felt that he was "in a good position" in Orlando and had "no need" to leave. (Brogan Dep., Doc. 57, Pg. ID 610; Whitsett Dep., Doc. 58, Pg. ID 972.) Accordingly, Brogan considered market factors, like the size of the market Whitsett would leave in Orlando — in comparison to the smaller market in Cincinnati — and the tax implications of moving to Cincinnati, when deciding on Whitsett's higher salary. (Brogan Dep., Doc. 57, Pg. ID 613-14.) And, Brogan testified that Whitsett's "skills and his experience within that bigger market is what necessitated that offer." (*Id.* at Pg. ID 614.) In fact, Brogan stated that, because Whitsett came from a bigger market, his skill level was at a "higher level than someone that is at a smaller market," and, for context, Whitsett's market in Orlando was double the size of the Cincinnati market. (*Id.*) Put more simply, Brogan stated that, in most cases, an anchor in a big market has better skills than one in a smaller market. (*Id.*) Contrary to Plaintiff's contention, WCPO did not pay Whitsett more merely because he made more previously or requested a higher salary. WCPO wanted an anchor with Whitsett's skills and experience and needed to incentivize Whitsett to leave a job with a bigger market, tax-beneficial location, and potential for a

raise. Given the substantial evidence to the contrary, no reasonable juror could find that WCPO paid Whitsett more on the basis of sex.

"[I]f the defendant carries its heavy burden of proving its affirmative defenses, the plaintiff must produce evidence creating a triable issue of fact as to whether the defendant's proffered explanation was pretextual." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021). However, besides her arguments that WCPO's defense lacks merit, Plaintiff has not produced evidence to this end. Thus, WCPO is entitled to summary judgment on this claim.

## II.      Counts II, IV, and VI: Employment Discrimination

Courts analyze Title VII claims and Ohio Civil Rights Act claims under the same standard. *Nelson v. Ball Corp.*, 656 F. App'x 131, 133 (6th Cir. 2016); *see also Newman v. Federal Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). In such cases, when a plaintiff has not presented any direct evidence of discrimination, like here, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, a plaintiff faces the initial burden of presenting a prima facie case, which creates a rebuttable presumption of discrimination that requires the defendant "to articulate some legitimate, nondiscriminatory reason for taking the challenged action." *Johnson v. Kroger Co.*, 319 F.3d, 866 (6th Cir. 2003) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000)) (cleaned up). Once the defendant satisfies this burden, the plaintiff must prove that the defendant's proffered reason was a "pretext to hide unlawful discrimination." *Id.* (quoting *Johnson*, 215 F.3d at 573) (cleaned up). WCPO asserts that it

16

is entitled to summary judgment on all of Plaintiff's age and sex discrimination claims. The Court will analyze each set of claims in turn.

### a. Plaintiff's Age Discrimination Claims

WCPO states that Plaintiff's age discrimination claims fail as a matter of law because she cannot demonstrate a prima facie case. (Motion, Doc. 13, Pg. ID 631.) To establish a prima facie case of age discrimination under the ADEA, Plaintiff must demonstrate: (1) she was over forty years old; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) she was either replaced by a person outside the protected class or treated differently than similarly situated, non-protected employees. *Smith v. Wrigley Mfg. Co.*, 749 F. App'x 446, 448 (6th Cir. 2018). WCPO further states that Plaintiff must bear the heightened burden of proving that age was the "but for" cause of the adverse action. (Motion, Doc. 60, Pg. ID 1027 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)).) Indeed, whether through direct or circumstantial evidence, every plaintiff must establish that age is the but-for causation in an ADEA claim. *See Blizzard v. Marion Technical College*, 698 F.3d 275, 282-83 (6th Cir. 2012); *McNeal v. City of Blue Ash, Ohio*, 117 F.4th 887, 894-95 (6th Cir. 2024).

WCPO does not dispute the four elements of Plaintiff's prima facie age discrimination claim; instead, it contends that Plaintiff fails to establish but-for causation. (Motion, Doc. 60, Pg. ID 1027.) Looking at the four elements of the claim, the Court agrees with Plaintiff that she has established a prima facie claim under the ADEA and Ohio law. As stated, the parties agree that she has met the four elements of the claim.

17

As Plaintiff has demonstrated a prima facie age discrimination claim, the burden shifts to WCPO to show that its reason for Plaintiff's termination was legitimate and non-discriminatory. WCPO argues that the non-renewal of Plaintiff's contract "was based on her pattern of on-air performance deficiencies," dating back to 2019, "recognized and documented by multiple different managers." (Motion, Doc. 60, Pg. ID 1027.) Some of these issues include her inappropriate comments about segregation, her failure to show up for work on Election Day, use of verbal crutches, ad-libbing, awkward tosses, and her on-air comments about Ketchmark's medical information and knowledge of alcohol. (*Id.* at Pg. ID 1027-28.) WCPO points out that Plaintiff received multiple warnings and conversations about these issues, and these ongoing problems were the reason for the non-renewal of her contract. (*Id.* at Pg. ID 1028.) Plaintiff does not dispute that she received these warnings and comments on her performance reviews; she admits that she struggled with many of these issues. (*See* O'Neill Dep., Doc. 56, Pg. ID 397, 409, 427-28.) Such well-documented evidence of issues, especially when the plaintiff admits to them, constitutes a legitimate, non-discriminatory reason for termination. *Sauer v. Univ. Internal Med. Assocs., Inc.*, No. 1:06-CV-264, 2008 WL 731492, at *9 (S.D. Ohio Mar. 17, 2008).

Plaintiff now has the burden to show that these proffered reasons are pretext for age discrimination by producing "sufficient evidence from which a jury could reasonably reject [WCPO]'s explanation of why it fired her." *Miles v. South Central Human Resources Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). As WCPO points out, though, she does not address any part of the factual record that shows WCPO's reasons are pretextual for age discrimination. (*See* Reply, Doc. 79, Pg. ID 1651-54.) Plaintiff argues that the history of

18

performance issues was pretext for WCPO's age discrimination and retaliation related to her complaint about her age. (Response, Doc. 76, Pg. ID 1552-59.)

Going through each stated issue, Plaintiff explains why she does not believe any of these purported reasons were the true cause of her termination. First, though, Plaintiff misses WCPO's argument that it was not just one of these incidents that caused her termination, but rather the pattern of issues, encompassing *all* the incidents. (*See* Motion, Doc. 60, Pg. ID 1027.) Nevertheless, the Court does not need to restate Plaintiff's arguments to show pretext. In none of them does Plaintiff point to any piece of evidence "from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated" against her. *Seeger v. Cincinnati Bell Telephone Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012) (cleaned up). As WCPO notes, the Sixth Circuit is clear that Plaintiff's "mere personal beliefs, conjecture, and speculation are insufficient to support an inference of discrimination." (Reply, Doc. 79, Pg. ID 1643, 1650 (quoting *Grizzell v. City of Columbus Div. of Police,* 461 F.3d 711, 724 (6th Cir. 2006) (cleaned up)).)

Furthermore, where Plaintiff argues that the stated reason is false, the Court finds otherwise. For instance, Plaintiff states that her performance reviews were positive between 2019 and 2022 and did not mention any of the issues WCPO cited as reasons for her non-renewal. (Response, Doc. 76, Pg. ID 1552.) But, the record tells a different story. Plaintiff had received a negative performance review in 2020 with some of the same issues mentioned later. (Q3 2020 Performance Review, Doc. 56-1, Ex. 14, Pg. ID 583.) She failed to show up for Election Day in 2020, and she received a reprimand about that as well. (Canan Letter, Doc. 56-1, Ex. 8, Pg. ID 572.) And, at the end of 2020, Plaintiff's

19

performance review noted she had shown some improvement, but it still mentioned she could work on some of the same problems stated earlier. (Q4 2020 Performance Review, Doc. 56-1, Pg. ID 586.) These issues do not become pretext simply because Plaintiff also had some positive reviews in that same timeframe.

Plaintiff also disputes that her comment about segregation contributed to her termination, stating that she "disagrees that she violated the WCPO Code of Conduct." (Response, Doc. 76, Pg. ID 1554.) But, disagreeing with WCPO's decision does not prove WCPO's reason was pretext for discrimination. *Galbraith v. N. Telecom, Inc.*, 944 F.2d 275, 280 (6th Cir. 1991). Without showing that WCPO's legitimate, non-discriminatory reasons for her termination were pretext for age discrimination, Plaintiff cannot maintain her age discrimination claims. She has failed to show that age was the but-for cause of her termination. *Gross*, 557 U.S at 180. WCPO is therefore entitled to summary judgment on these claims. *Carter v. Toyota Tsusho America, Inc.*, No. 5:10-CV-132, 2012 WL 786344, at *6 (E.D. Ky. Mar. 9, 2012) ("Plaintiff has failed to offer sufficient evidence to rebut Defendant's legitimate non-discriminatory reason for terminating his employment and, thus, has not created a genuine issue for trial.").

### b.    Plaintiff's Sex Discrimination Claims

Plaintiff next brings claims of sex discrimination under both Title VII and Ohio law. To establish a prima facie case of sex discrimination, Plaintiff must show that: (1) she is a member of a protected group; (2) she experienced an adverse employment action; (3) she was otherwise qualified for the position; and (4) similarly situated non-protected employees were treated more favorably. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814

20

F.3d 769, 776 (6th Cir. 2016). WCPO argues that Plaintiff cannot establish a prima facie case because her sex discrimination claim is premised on the fact that Whitsett was paid more than she was, and, as it argues for her EPA claim, the pay disparity was not discriminatory. (Motion, Doc. 60, Pg. ID 1027, n.3.) Plaintiff, however, maintains that both her lower pay and her termination were adverse actions she experienced because of her sex. (Response, Doc. 76, Pg. ID 1563; *see also* Am. Compl., Doc. 10, ¶¶ 61-72, 78-84.) The Court will accordingly proceed under Plaintiff's theory of her claims.

WCPO does not dispute the first three elements of her prima facie case but argues that Plaintiff cannot show that a similarly situated, non-protected individual was treated more favorably. (Motion, Doc. 60, Pg. ID 1028-29.) Regarding Plaintiff's lower pay compared to Whitsett, the Court has already determined that Whitsett received a higher salary because of market factors and negotiations. The Court, therefore, does not find that Plaintiff and Whitsett are similarly situated for purposes of salary comparison. *Beck-Wilson v. Principi*, 441 F.3d 353, 369 (6th Cir. 2006) ("An employer may therefore avoid liability under a Title VII wage discrimination claim if it can establish one or more of the four affirmative defenses in the EPA.") Nevertheless, Plaintiff states that Whitsett did not receive any discipline or face termination for mistakes he made on air. (Response, Doc. 76, Pg. ID 1563.) But, WCPO rebuts that Whitsett is not a proper comparator, pointing to the fact that, when asked for examples besides pay where Whitsett was treated more favorably, Plaintiff admitted she "[could not] think of anything." (Motion, Doc. 60, Pg. ID 1029; *see also* O'Neill Dep., Doc. 56, Pg. ID 442-43.) Nor could she recall a time when Whitsett should have been subjected to discipline. (*Id.*) Accordingly, WCPO concludes

21

that "Plaintiff cannot point to Whitsett as a valid comparator as he did not engage in the same performance issues that Plaintiff suffered from." (*Id.* (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 305 (6th Cir. 2016)).)

Plaintiff's Response points to a statement in the record where she noted that there were "occasions when [Whitsett] laughed or talked about something more and was not called out for it." (Response, Doc. 76, Pg. ID 1562; *see also* O'Neill Dep., Doc. 56, Pg. ID 443.) But, following that statement, Plaintiff was asked whether Whitsett had more occasions of laughing or talking too much, and Plaintiff stated, "I don't remember how many occasions there were, but I would say we have different personalities, so we have different strengths and issues." (O'Neill Dep., Doc. 56, Pg. ID 443.) Thus, Plaintiff herself admitted that Whitsett did not engage in the same pattern of behavior issues with which she struggled. As WCPO reiterates in its Reply, "[t]he law supports the common-sense fact that someone without long-standing performance issues cannot be a valid comparator to a plaintiff with long-standing performance deficiencies identified by her employer." (Reply, Doc. 79, Pg. ID 1647 (quoting *Tennial*, 840 F.3d at 305)).) Nowhere else on the record can Plaintiff point to another male employee with similar performance issues who did not receive the same treatment as she did. Thus, Plaintiff cannot establish the fourth element of her prima facie case. WCPO is entitled to summary judgment on Plaintiff's sex discrimination claims.

### III.     Counts III, V, and VII: Retaliation Claims

Plaintiff's remaining claims state that WCPO retaliated after she complained about the station's age and sex discrimination. (Am. Compl., Doc. 10, ¶¶ 56-60, 73-77, 85-88.) To

22

establish a prima facie case for retaliation under either Title VII or Ohio Revised Code § 4112, Plaintiff must prove that: (1) she engaged in a protected activity under Title VII; (2) Defendant knew she exercised her protected rights; (3) Defendant took an adverse employment action against her; and (4) Plaintiff's protected activity was the direct cause of the adverse employment action. *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730-31 (6th Cir. 2014)). If Plaintiff successfully establishes her prima facie case, then the *McDonnell Douglas* framework shifts the burden to WCPO to show a "legitimate, nondiscriminatory reason for its action." *McDonnell Douglas Corp.*, 411 U.S. at 802. And, if WCPO satisfies that burden, then Plaintiff must demonstrate that WCPO's proffered reason is pretext for discrimination. *Id.* at 804.

WCPO argues that Plaintiff's retaliation claims fail because she has failed to put forth a prima facie case for them. (Motion, Doc. 60, Pg. ID 1032.) First, WCPO maintains that Plaintiff's vague comment about why she was not chosen to go to the Super Bowl is not protected activity. (*Id.* at Pg. ID 1033.) And, in any event, WCPO contends that Plaintiff fails to establish the fourth element, causation. (*Id.* at Pg. ID 1035.) The Court will examine each argument below.

Beginning with the second element, both parties agree that Plaintiff's question to Fulmer, and later Rawe—whether she was the "wrong age, gender, or color" to anchor the Super Bowl—is the purported protected activity and that it should be analyzed as "opposition clause" activity. (Motion, Doc. 60, Pg. ID 1032; Response, Doc. 76, Pg. ID 1547-48.) However, WCPO disagrees that the activity does not qualify as protected.

(Motion, Doc. 60, Pg. ID 1032.) As WCPO points out, the Sixth Circuit "expressly holds that the opposition clause provides less protection than the participation clause." (Motion, Doc. 60, Pg. ID 1032 (citing *Booker v. Brown & Williamson Tobacco Co., Inc.* 879 F.2d 1304, 1312-13 (6th Cir. 1989)).) For an activity to qualify as protected opposition activity, Plaintiff must have "a good faith belief that the law has been violated," and "that belief must be objectively reasonable." (*Id.* at Pg. ID 1033 (quoting *Eydie Glasstetter v. Rehab Serv. Comm'n*, No. 2:07-CV-125, 2010 WL 2465356, at *10 (S.D. Ohio June 14, 2010)) (cleaned up).) Indeed, "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." *Booker*, 879 F.2d at 1313. And, a "mere reference" to age or sex discrimination does not constitute protected activity. *E.E.O.C. v. Unitrin Specialty*, No. 3:08-CV-302, 2008 WL 4372680, at *11 (S.D. Ohio Sept. 22, 2008) (plaintiff's complaint about his employer's actions taken against this "over 40 year old man" was too vague to constitute protected activity).

In *Booker v. Brown & Williamson Tobacco Co., Inc.* 879 F.2d 1304, 1313 (6th Cir. 1989), the plaintiff told management that complaints about his work performance were examples of "ethnocism [sic]." The Sixth Circuit noted that the plaintiff "was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer." *Id.* at 1313. At the same time, the Sixth Circuit has clarified that a plaintiff need not lodge a complaint "with absolute formality, clarity, or precision" for it to constitute protected activity. *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013). In cases where courts have found protected

24

opposition activity, though, the plaintiffs had threatened to sue over discrimination and pointed to specific practices they believed to be unlawful. *See, e.g., Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 113 (6th Cir. 2018); *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645-46 (6th Cir. 2015). WCPO contends that Plaintiff's question is more akin to the comments in *Booker* and notes that Plaintiff did not follow up her question to Fulmer with complaints to Human Resources or other management personnel about discrimination. (Motion, Doc. 60, Pg. ID 1035.) But, in response, Plaintiff notes that management and Human Resources wanted to meet to discuss her claim of discrimination, which shows that WCPO understood her comments to be a specific charge of discrimination about her non-selection. (Response, Doc. 76, Pg. ID 1549; *see also* O'Neill Dep., Doc. 56, Pg. ID 412.) Thus, viewing the evidence in a light most favorable to Plaintiff, the Court operates under the assumption that her question was more than a "vague charge of discrimination" and constitutes protected activity.

Nevertheless, WCPO argues that Plaintiff's claims fail on the fourth element as well. (Motion, Doc. 60, Pg. ID 1035.) According to WCPO, Plaintiff has failed to allege causation between her question to Fulmer in early 2022 and her demotion to reporter and non-renewal of her contract in September 2022. (*Id.*) WCPO contends that Plaintiff can only point to a seven or eight month temporal proximity of the two events, which this Court has rejected as sufficient to show causation. (*Id.* at Pg. ID 1036.) And, "[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." (*Id.* (quoting *Popeck v. Rawlings Co. LLC*, No. 3:16-CV-138, 2018 WL 2074198, at *14 (W.D. Ky. May 3, 2018), *aff'd*, No. 19-5092,

2019 WL 5208133 (6th Cir. Oct. 16, 2019) (quotation omitted)).) As WCPO notes, and as this Court has established, Plaintiff had a history of performance issues that predated her protected activity. (*Id.*) Moreover, WCPO points out that Plaintiff's performance deficiencies *after* her protected activity, including her reference to Ketchmark's medical information on air, resulted in further complaints against Plaintiff and cut off the causal link between her question to Fulmer and her termination. (*Id.* at Pg. ID 1036-37.) Thus, WCPO argues that Plaintiff has not provided evidence sufficient to show causation.

In response, Plaintiff asserts first that, while temporal proximity alone is generally insufficient to establish causation, it can be "where a defendant takes advantage of its first meaningful opportunity to retaliate against a plaintiff, even if that opportunity didn't arise until months after plaintiff's protected activity." (Response, Doc. 76, Pg. ID 1550-51 (citing *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 665 (6th Cir. 2020)).) Second, an employee can prevail if she couples temporal proximity with other evidence of retaliatory conduct. (*Id.* (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 460-61 (6th Cir. 2020)).) Accordingly, Plaintiff maintains that, after she engaged in her protected activity, WCPO intensified its scrutiny of her performance, and she began receiving negative reviews, despite having been told to "keep up the good work" in January 2022. (*Id.*)

But, WCPO points out that Plaintiff admitted that the criticism she received in 2022 was "valid," even stating herself that she made an "awkward toss," and other awkward comments on air that year. (Reply, Doc. 79, Pg. ID 1656; *see also* O'Neill Dep., Doc. 56, Pg. ID 415-16; Email, Doc. 56-1, Pg. ID 574; Q1 2022 Performance Review, Doc. 56-1, Pg. ID

581-82.) Furthermore, these numerous incidents represent "numerous 'opportunities' to retaliate shortly after her alleged protected activity," but Plaintiff was not terminated after any of these; thus, the COVID incident was not merely the first opportunity to retaliate, as Plaintiff suggests. (*Id.*) Additionally, as the Court has noted, many of the issues mentioned on the 2022 reviews had been stated on earlier reviews as issues Plaintiff needed to address, in addition to other deficiencies, like missed work, that occurred prior to 2022. (*Compare* Suspension, Doc. 56-1, Ex. 7, Pg. ID 571, *and* Q3 2020 Performance Review, Doc. 56-1, Ex. 14, Pg. ID 583, *and* Q4 2020 Performance Review, Doc. 56-1, Pg. ID 586, *and* Canan Letter, Doc. 56-1, Ex. 8, Pg. ID 572, *with* Brogan Email, Doc. 56-1, Ex. 10, Pg. ID 574, *and* O'Neill Dep., Doc. 56, Pg. ID 416, *and* Q1 2022 Performance Review, Doc. 56-1, Ex. 13, Pg. ID 581, *and* Q3 2022 Performance Review, Doc. 56-1, Ex. 16, Pg. ID 588.) In fact, the Sixth Circuit has cautioned that "employees who see the proverbial writing on the wall that they are about to be fired should not be able to use Title VII protections to insulate themselves from adverse employment actions that were previously contemplated." *Tharp v. Apel Int'l, LLC*, No. 21-6070, 2022 WL 2981770, at *3 (6th Cir. July 28, 2022) (cleaned up). The Court therefore agrees with WCPO; Plaintiff has failed to show evidence sufficient to establish causation between her protected activity and termination. WCPO is entitled to summary judgment on Plaintiff's retaliation claims.

## CONCLUSION

Based on the foregoing reasons, the Court **ORDERS** the following:

1. Defendant's Motion for Summary Judgment (Doc. 60) is **GRANTED**;

27

2. Summary judgment is **ENTERED** in favor of Defendant Scripps Media, Inc., on all of Plaintiff's claims; and

3. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

28